DowNex, Judge,
delivered the opinion of the court.
Plaintiff and its predecessor companies performed service for a number of years by way of transportation of stone from Pfeiffer’s quarry near Batesville, Arkansas, to Leavenworth, Kansas, consigned to the U. S. penitentiary in or near that city. Batesville was a point on the old St. Louis, Iron Mountain & Southern, one of plaintiff’s predecessor companies, and was reached by no other line, and Leavenworth was a point on the old Missouri Pacific which controlled the St. Louis, Iron Mountain & Southern. Plaintiff’s lines reached Leavenworth proper but not the penitentiary reservation, and in consequence cars delivered by plaintiff at Leavenworth must be switched to the penitentiary, a service which might be performed by either of two roads, each of which provided in its tariffs for a switching charge of $4.00 per car. For about fourteen years this switching charge was paid by the plaintiff on all cars of stone consigned to the penitentiary and added to its bills, which were paid by the warden of the penitentiary, whose accounts were regularly examined by the proper auditor and such payments approved. After the expiration of this period there was a reexamination of the warden’s accounts from the beginning, a conclusion that the switching charges had been improperly paid, and a deduction of the amount herein sued for from subsequent accounts of the plaintiff. There was also a further deduction directed by the comptroller on account of land-grant rates, but in that respect that decision was after-wards reversed. The sole question in this case as presented is as to the switching charges mentioned.
This question thus stated sounds very simple, but it is complicated by the injection into the record of many tariffs *443 with usual complications and diversified constructions. They are all referred to in the petition and findings of fact and discussed in the official reports and testimony of the witnesses, all of which are commended to the searcher for details. We shall not here consider them in detail, but content ourselves with general observation and conclusions made as brief as possible.
When in 1904 improvements requiring large quantities of stone were in contemplation at the penitentiary the warden, preliminary to letting contracts and in anticipation of a contract for stone from Pfeiffer’s quarry, near Batesville, Arkansas, asked for freight rates thereon. The rate then in force from Batesville to Leavenworth, via the plaintiff’s predecessors’ lines and admittedly a local rate of these lines, was fifteen cents per hundred in car load lots of 40,000 pounds against which a small percentage of land grant was to be computed. The quarry was a short distance away from Batesville for which haul a distance tariff was applicable, but the contemplated transportation was treated as from Batesville and a rate quoted from Batesville to Leavenworth of twelve and one-half cents per hundred, practically the existing rate with land grant deducted, and switching charges from Leavenworth to the penitentiary additional. The rate was accepted, shipments commenced and, largely for the information of its employees and to protect the rate, a tariff was issued naming this rate to “ apply only on shipments consigned to the Federal prison, Ft. Leavenworth, Kansas, the switching charge from Leavenworth, Kansas, to the Federal prison to be additional.”
Seemingly there is no possible room for dispute as to the situation at this period. This tariff was purely local, it specifically provided for switching charges in addition to the quoted rate and, the character of the rate and service considered, it would seem, and in fact it is proven by expert testimony, not only that the plaintiff was not required to absorb the' switching charges but was prohibited from so doing. Strangely, when the accounts of the warden were reopened by the auditor the disallowances reached back through this entire period. Some time afterward the rate was incorporated into other tariffs, the note referred to as to *444 switching charges was omitted, it found its way into a “ local and joint” tariff, the details of which otherwise appear, and it came to be contended that the rate named in a local and joint tariff was a joint rate, the business competitive and the switching charges to be absorbed by the plaintiff company.
’ It is perhaps well to observe that no question had ever been made as to the payments of switching charges by the warden and the passing of his accounts in that respect until, in 1917, his accounts for the quarter ending December 31, 1916, were under examination, in which accounts credit was claimed for the payment of $88.00 as switching charges on 22 car loads of stone. The auditor did not disallow the items as improper charges but disallowed $2.00 of each claimed credit of $4.00 per car for switching on the theory that because the Government owned tracks on the penitentiary reservation which were used in switching the cars the Government should participate 50-50 in the switching revenues.
Thus at this late date, after more than twelve years of approval of such charges, the auditor still does not question the propriety of a switching charge, but upon an appeal by the warden to the comptroller, it was held, without, so far as the opinion shows, giving consideration to the auditor’s theory, that the plaintiff company must absorb the switching charge, and the one-half thereof for which the auditor had allowed the warden credit was also disallowed.
Subsequently, in October, 1917, 24 Comp. Dec. 193, there was a reconsideration on application of the plaintiff company, and following that decision, the auditor, in 1918, in settling bills of plaintiff for transportation of stone in 1917, made deduction of switching charges back to August, 1905, amounting to $2,531.19 and on appeal the auditor’s action was affirmed by the comptroller.
Thus was a construction of many years’ standing reversed, by reason of which accounts long settled were reopened and payment made more than a dozen years before held to have been illegally made and charged against current bills. This court has repeatedly within recent years considered the conduct of plaintiffs Avith reference to present *445 ment and prosecution of their claims, acceptance of settlements without protest, or other acts indicating acquiescence in settlements made as precluding recovery, and in some such cases we have predicated the justice of the rule upon the necessities of the Government service and in the particular respect that there be an end' to accounting. The rule is a salutary one. The plaintiff in this case, did it seek to assert some further claim with reference to service here involved, might, under the holdings of this court, be precluded from asserting the same, even when not barred by the statute of limitations, by reason of its acquiescence in settlements made, founded to an extent, as said, on tha necessity for finality. But a settlement of long standing, opened up by the Government, is as effectually opened up as if such action were to be permitted by a claimant, and against that, under such circumstances as these, Government officials would strenuously protest. Departmental construction has weight when the meaning of statutes is in question; long continued departmental practice is of still more weight. And it is not consistent that rules invoked by the Government in its favor are of no force when operating otherwise. It is true that the cases before the comptroller involved in the first instance particular items of transportation, and it was the cases presented which were decided, and it was but natural to conform decision to the case presented, but the subsequent action of the auditor in reopening the whole account reached back of current questions, disturbed the dust-covered settlements of years before, blinded the eyes of justice to established practice of such antiquity as to deserve a better fate, and branded the rule, supposed salutary because tending to finality in accounting, as a “ poor rule ” by determining that it was not made to “ work both ways.”
But aside from this feature of the case it must be held that the switching charges in question were properly charged and collected. During the early stages of these transactions the proposition can not be disputed. There is no room for other construction. With that situation as a conceded fact, the Government maintains that subsequent action so changed the character of the rate and service as *446 to render the charge an improper one. But the Government had paid these charges during all these years and then asserted its right to set them off against other sums due the plaintiff for other service.
There is no doubt about the right of set-off, but the right of the Government to set-off and retention of the amount from sums otherwise due is dependent upon the validity of the Government’s claim which it seeks to set off, and the fact that it has exercised the right of set-off does not relieve it, in case of suit, from assuming the burden of proof just as if it were a case of set-off pleaded.
Aside from technical questions as to constructions of tariffs it naturally occurs to one to seek a reason why a railroad company, having established its own local rate-on noncompetitive business with switching charges added,, should so thereafter change its tariffs as to make its rate “ joint” and require the absorption of switching charges on a competitive basis. If intention is to govern construction the presumption is against any such intended change. If, without intention, the change was made it must be so determined from technical constructions of tariffs eliminating intention. The plaintiff disclaims intention to make any such change. The defendant asserts it was made and relies on technical construction of tariffs.
In this connection, as illustrative of the line of argument, much is made of the fact that the rate for this service was, after a time, incorporated in a local and joint tariff and the argument is that the “joint and local” tariff applied and the switching charges were absorbed. We understand what is meant by a “local” rate and what is meant by a “joint”' rate but we do not comprehend a “ joint and local ” rate. But we are furnished in the record in this case some very valuable testimony by a disinterested expert whose qualifications commend him, and from this testimony, if it were otherwise a doubtful proposition, it clearly appears that it is a common practice to incorporate local rates in a tariff also carrying joint rates and properly entitled joint and local, so that the fact that this rate appeared in a “local and joint” tariff did not deprive it, *447 of its character as a local rate. And the argument that because there were two competing roads, over either of which the cars might be switched from Leavenworth to the penitentiary, makes the haul from Batesville to Leavenworth competitive, is equally without weight.
Further discussion of other propositions can be of no value, since the conclusion reached can not be affected thereby. We are of the opinion that the switching charges in question were proper charges and this conclusion requires a judgment for the plaintiff in the sum of $2,582.84, which we have directed.
Graham, Judge; Hay, Judge; Booth, Judge; and Camp.bell, Chief Justice, concur.